UNITED STATES of America, Appellant,

v.

INTERSTATE COMMERCE COMMISSION, Western Pacific Railroad Company, et al., Appellees.

No. 17213.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 14, 1963.

Decided Feb. 21, 1963.

---

Miss Kathryn H. Baldwin, Attorney, Department of Justice of the bar of the Supreme Court of Wisconsin, *pro hac vice,* by special leave of court, with whom Acting Asst. Atty. Gen. Joseph D. Guilfoyle and Messrs. David C. Acheson, U. S. Atty., and Alan S. Rosenthal, Attorney, Department of Justice, were on the brief, for appellant. Mr. Sherman L. Cohn, Attorney, Department of Justice, also entered an appearance for appellant.

Mr. Fritz R. Kahn, Assistant General Counsel, Interstate Commerce Commission, for appellee Interstate Commerce Commission.

Mr. D. Robert Thomas, Chicago, Ill., of the bar of the Supreme Court of Illinois, *pro hac vice,* by special leave of court, with whom Messrs. Lawrence Cake and Raymond A. Negus, Washington, D. C., were on the brief for appellee Western Pacific Railroad and certain other appellees.

Before WILBUR K. MILLER, FAHY and DANAHER, Circuit Judges.

FAHY, Circuit Judge.

One of the basic problems in this case was decided by the Supreme Court in United States v. Western Pacific Railroad Co. et al., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), on certiorari to the Court of Claims. The controversy was then in large part, and is now entirely, whether the three railroads,[1] intervening defendants in the District Court and appellees here, charged the United States an unlawful rate for shipments of steel aerial bomb casings filled with napalm gel and Pt-1 gel, these compositions being described as thickened gasoline filler.[2] In the shipments, which were in carload lots, the articles, to which we shall refer as bombs, did not contain bursters, fuses or arming wires. Thus, they were not finished rounds of ammunition. Before they could function as live incendiary bombs it was necessary for fuses and bursters to be attached. An arming wire is part of a safety device to prevent the bomb when in the bomb rack of an aeroplane from being exploded until after release from the rack.

The railroads applied the first-class rating in Item 1820 of Consolidated Freight Classification No. 16, which reads in pertinent part as follows:

| Item | Articles | Carload Ratings |
|---|---|---|
| 1800: | AMMUNITION, Explosive, Incendiary or Gas, Smoke or Tear Producing, see Note 1, item 1805: | |
| 1805: | Note 1.—Subject to Rule 39, * * *. | |
| 1820: | Bombs or mines, loose or in packages. | 1 |

The figure 1 under "Carload Ratings" indicates that articles to which Item 1820 is applicable carry a first-class rating, which calls for the highest tariff.

The position of the United States is that since the bombs were shipped without bursters and fuses the first-class rating was inapplicable, and also that the rates charged upon the basis of that classification[3] were unjust and unreasonable within the meaning of Section 1(5) of the Interstate Commerce Act, 49 U.S.C.

---

1. Western Pacific Railroad Company, Seaboard Air Line Railroad Company and Bangor & Aroostook Railroad Company.

2. It appears that napalm gel is composed of 88% gasoline and 12% napalm thickener, which is a granular powder of aluminum soap and acids. The Pt-1 gel or Pyrogel is produced by mixing various proportions of magnesium, petroleum oil extract, petroleum pressure distillate, borium nitrate, ammonium perchlorate, isobutyl methacrylate, and gasoline.

3. It appears, although we do not believe this is material to decision of the case, that the full first-class rate was not charged having been reduced to 65% of first-class by reason of Section 22 quotations given to the Government.

§ 1(5). Enlarging upon this position the Government urges that these bombs, for purposes of classification and rates, were comparable to drums of gasoline, which are transported by the railroads at substantially lower rates.

When the case reached the Supreme Court the controversy had not been passed upon by the Interstate Commerce Commission. The Supreme Court held that the doctrine of primary jurisdiction applied, necessitating initial consideration and decision by the Commission, the courts in the meantime to suspend the exercise of jurisdiction. On remand to the Court of Claims further proceedings were suspended and the matter was referred to the Commission. After hearing the Commission decided that the classification used by the railroads applied, and also that the resulting rates were not unjust, unreasonable or unlawful. The United States sued in the District Court pursuant to 28 U.S.C. §§ 1336 and 1398, and Section 17(9) of the Interstate Commerce Act, 49 U.S.C. § 17(9), to enjoin, set aside, annul and suspend the order of the Commission to that effect. The court dismissed the complaint, and this appeal of the United States followed.

In now passing upon the matter we refer particularly to the following statement of the Supreme Court when the problem was before it prior to Commission decision:

"Courts which do not make rates cannot know with exactitude the factors which go into the rate-making process. And for the court here to undertake to fix the limits of the tariff's application without knowledge of such factors, and the extent to which they are present or absent in the particular case, is tantamount to engaging in judicial guesswork. It was the Commission and not the court which originally determined why incendiaries should be transported at a high rate. It is thus the Commission which should determine whether shipments of napalm gel bombs, minus bursters and fuses, meet those requirements; that is, whether the factors making for certain costs and thus a certain rate on incendiaries are present in the carriage of such incompleted bombs." 352 U.S. 59, 67–69, 77 S.Ct. 167.

Giving deference to the expertise of the Commission in the exercise of its primary jurisdiction, following the Supreme Court decision, we affirm the District Court.

The Commission considered the factors underlying the application of incendiary bomb rates to these articles. Cf. United States v. I.C.C., et al., D.C.Cir., 309 F.2d 645 (1962). In deciding that the bombs came within the challenged classification the Commission considered the history of negotiations leading to the adoption of the classification and its past coverage, concluding that the articles as shipped were ratable as incendiary bombs. The Commission has discharged its responsibilities as described by the Supreme Court. We quote from the Commission decision the following passages as illustrative of the manner in which it has done so:

"The evidence shows the unusual care and expensive handing which were necessary in moving these shipments of incendiary bombs. The cars had to be of the best quality and condition, and they had to be dust-proof, light-proof, and spark-proof. To supply such cars required additional maintenance and other expenses. * * * Expensive inspection and maintenance procedures were affected in order to meet the rigid standards set by the Government arsenals. All cars had to be carefully cleaned. * * * Special efforts were made by the railroads to expedite the shipments, not only to aid the war effort, but also to get the munitions off their property.

\* \* \* \* \* \*

The Chief of the Bureau of Explosives testified that although the incendiary bombs shipped without bursters and fuzes did not come within the regulations for the transportation of explosives, this did not mean that they were not in

fact hazardous or dangerous, nor did it mean that no special care was necessary in transporting them.

\*   \*   \*   \*   \*   \*

"Because of the [dangerous] placards, the railroads were compelled to handle the cars with care equal to that required by the Commission's regulations for the movement of explosives and other dangerous articles. This added to the transportation cost, especially when the yard congestion at the arsenals and the ports became acute. \* \* \*"

In view of the analysis by the Commission of the factors upon which it based its decision, and its conclusion from such analysis that the rates charged were lawful, we find no basis in the record for requiring a different result at the hands of the courts.

Affirmed.